**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

|  |  |  |
|---|---|---|
| Del Valle Fresh, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| United States Department of Labor; Office | ) | Civil Action Number: 7:25-cv-3721-BHH |
| of Administrative Law Judges of the United | ) | |
| States Department of Labor; Lori | ) | |
| Chavez-DeRemer, Secretary of the U.S. | ) | |
| Department of Labor; and Paul R. | ) | |
| Almanza, Administrative Law Judge of the | ) | |
| United States Department of Labor, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

Under Congress's foreign-commerce and immigration-related powers, "[t]he United States has long provided temporary work authorization for foreign agricultural workers." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021). To that end, the "H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's." H.R. Rep. No. 99-682(I), at 50 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654. And since 1986, Congress has tasked the Secretary of Labor with regulating the H-2A program and "tak[ing] such actions, including imposing appropriate penalties" as "may be necessary to assure" compliance with the program. 8 U.S.C. § 1188(g)(2). Now, Plaintiff Del Valle Fresh contends that the Department of Labor's enforcement regime—which uses administrative law judges ("ALJs") to adjudicate H-2A violations—contravenes Article III and the Seventh and Fifth Amendments of the Constitution and the Administrative Procedure Act.

Plaintiff asserts that the Supreme Court's recent decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), compels this Court to conclude that Plaintiff is entitled to a jury trial in an Article III court.[1] But *Jarkesy* reiterated what an unbroken line of Supreme Court precedent has made clear: Congress' "plenary power over immigration" implicates matters of public rights that can be constitutionally adjudicated within the Executive Branch. *Id.* at 129. And enforcing the Immigration and Nationality Act, and its associated regulations, is a quintessential area of "public rights" that cannot be analogized to proceedings traditionally recognized at common law. Because Plaintiff's claims fail on the merits, Plaintiff can neither establish any irreparable harm nor that the balance of the equities is in Plaintiff's favor. Accordingly, this Court should deny Plaintiff's motion for a temporary restraining order and a preliminary injunction.

## BACKGROUND

### I.     Statutory and Regulatory Framework

In the Immigration and Nationality Act, Congress "established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *La. Forestry Ass'n Inc. v. U.S. Dep't of Labor*, 745

---

[1] After Plaintiff moved for a temporary restraining order and preliminary injunction seeking to enjoin the underlying administrative proceedings, the U.S. Court of Appeals for the Third Circuit issued a decision in *Sun Valley Orchards, LLC v. U.S. Dep't of Labor*, No. 23-2608, — F.4th —, 2025 WL 2112927 (3d Cir. July 29, 2025) ("*Sun Valley*"). In *Sun Valley*, the Third Circuit concluded that adjudication of H-2A violations where the Department sought back wages and civil penalties concerned private contractual rights and did not fall within the immigration public rights exception to Article III adjudication. 2025 WL 2112927, at *5, 7. Defendants believe *Sun Valley* was wrongly decided for the reasons set forth in the Federal Defendants' answering brief in *Sun Valley*, and the time has not yet run for the government to seek further review of that decision. Defendants anticipate that Plaintiff will seek to rely on *Sun Valley* in this case, but *Sun Valley* is not controlling authority in this Court.  Moreover, there is additional out-of-circuit authority distinguishing *Sun Valley* and upholding the Department's ability to constitutionally adjudicate immigration violations administratively. *Butler Amusements, Inc. v. U.S. Dep't of Labor*, No. 24-1042, 2025 WL 2457687, at *6-9 (D.D.C. Aug. 26, 2025) (analyzing violations in the H-2B program, a similar program involving temporary foreign workers).

F.3d 653, 659 (3d Cir. 2014). As part of the Act, Congress created the H-2 visa program which permits U.S. employers to recruit and hire foreign workers for temporary agricultural and non-agricultural jobs. *Id.*; *USA Farm Labor, Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *1 (4th Cir. Feb. 24, 2025). Congress then amended the program as part of the Immigration Reform and Control Act of 1986 ("IRCA"), to establish separate requirements for agricultural and nonagricultural foreign workers. Pub. L. No. 99- 603, title III, part A, § 301, 100 Stat. 3359, 3411. In Title III of that Act, concerning the "Reform of Legal Immigration," Congress provided a "new 'H-2A' nonimmigrant classification for temporary agricultural labor." 100 Stat. at 3411 (capitalization altered). The new H-2A visa regime allowed for the controlled "admission of temporary H-2A workers," and created a framework whereby prospective employers would "petition to import an alien" subject to certain conditions and approval by the Executive Branch. *Id.* (capitalization altered).

Workers eligible for an H-2A visa must have "no intention of abandoning" their permanent residence in a foreign country. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Thus, H-2A workers "have no independent route to apply for permanent residency or legal citizenship," but instead are "dependent on their [employer] visa sponsors to lawfully stay in and return to the United States for work." *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 382 (D.C. Cir. 2018). Because of that continuing intention to return to their country of origin, H-2A workers are defined to be "nonimmigrant aliens." 8 U.S.C. § 1101(a)(15). Although "[f]oreign agricultural labor has contributed to the growth and success of America's agricultural sector since the 19th century," *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement*, 73 Fed. Reg. 77,110, 77,111 (Dec. 18, 2008), Congress did not want H-2A workers to displace the domestic labor force.

Thus, Congress tasked the Department of Labor with certifying, as a condition for the potential admission of H-2A workers, that "there are not sufficient workers who are able, willing, and qualified" to perform the agricultural work and that employing H-2A workers "will not adversely affect the wages and working conditions of" similarly employed workers in the U.S. 8 U.S.C. § 1188(a)(1).

Under the H-2A program, qualifying employers may hire foreign workers "to perform agricultural labor or services" of "a temporary or seasonal nature" in the United States. *Id*. § 1101(a)(15)(H)(ii)(a). To do so, the employer must first seek certification from the Department of Labor that (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed" to fill the open position, and (2) hiring foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 1188(a)(1); 20 C.F.R. § 655.100. After a certification issues, Congress directed that the employer must hire qualified U.S. workers who apply for the job during the first half of the "period of the [seasonal] work contract." 8 U.S.C. § 1188(c)(3)(B)(i); *accord* 20 C.F.R. § 655.135(d). And Congress required the sponsoring employer to "provide benefits, wages and working conditions required pursuant to this section and regulations," and to comply with other certification requirements. 8 U.S.C. § 1188(c)(3)(A)–(B). Thus, an employer's job offer must give workers in the U.S. "no less than the same benefits, wages, and working conditions" that will be available to H-2A workers, 20 C.F.R. § 655.122(a), and the regulations set forth various requirements to protect similarly employed workers from adverse effects to their "wages and working conditions." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act*, 52 Fed. Reg. 20,524, 20,524 (June 1, 1987).

Employers voluntarily choose to participate in the H-2A program because it confers benefits not afforded to other employers in the United States: the ability to hire foreign workers to fulfill temporary labor needs. To obtain these benefits, however, an employer must agree to abide by the terms of the program, including those established by the Labor Department's H-2A regulations, as Congress directed. *See, e.g.,* 8 U.S.C. § 1188(c)(3); 20 C.F.R. § 655.135. Even "after an employer's H-2A application is approved and the employer hires foreign laborers," the employer "must continue to provide its American and foreign workers the minimum wages and working conditions laid out in the regulations to ensure the employment of foreign workers does not adversely affect the terms of employment of similarly employed American workers." *Mendoza v. Perez*, 754 F.3d 1002, 1008 (D.C. Cir. 2014) (citing 20 C.F.R. § 655.122(a)); 8 U.S.C. § 1188(a)(1)(B). Those regulations require, among other things, payment of the proper wages for all hours worked, providing suitable housing that meets regulatory requirements, not charging the workers unlawful fees, not intimidating or threatening workers who engage in protected activity, and not providing fraudulent pay statements. *See generally* 20 C.F.R. §§ 655.122, 655.135.

The Secretary of Labor is responsible for enforcing the requirements of the H-2A program. *Ruiz v. Fernandez*, No. CV-11-3088-RMP, 2012 WL 1442556, at *3 (E.D. Wash. Apr. 26, 2012). In passing the IRCA, Congress authorized the Secretary of Labor "to take such actions, including imposing appropriate penalties" as "may be necessary to assure employer compliance with terms and conditions of employment under this section." Pub. L. No. 99-603, tit. III, § 301, 100 Stat. 3359, 3416 (codified at 8 U.S.C. § 1188(g)(2)). An employer's use of the H-2A program is only permissible under the immigration laws if the Secretary of Labor has issued the required certification as to sufficiency of workers and prevention of adverse effect. And such certification is

only meaningful if the conditions underlying it can be enforced by the Department of Labor. To that end, within months of the IRCA's enactment, the Secretary promulgated regulations authorizing administrative proceedings to recover back wages, enforce program obligations, and assess civil money penalties for violations of the Act or its implementing regulations. 52 Fed. Reg. at 20,524, 20,527 & 20,531 (promulgating 29 C.F.R. § 501.16). Through these administrative proceedings, the Administrator may impose civil monetary penalties which may be assessed for "each violation" of the statute or regulations. 29 C.F.R. § 501.19(a), (b). That includes potential monetary penalties "for each violation committed against each worker." 52 Fed. Reg. at 20,531 (promulgating 29 C.F.R. § 501.19).

If the Department of Labor determines that an employer violated the Act or its implementing regulations, it notifies the employer of its findings as well as the remedies sought. 29 C.F.R. §§ 501.31, 501.32. The employer can request a hearing before an ALJ, *id*. §§ 501.33-35, who will preside over an adversarial hearing and issue a decision, *id*. § 501.41. Department of Labor regulations specify that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for," *id*. § 18.10(a). The parties can move to dismiss, *id.* § 18.70(c), take discovery, *id.* §§ 18.50–65, and move for the equivalent of summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id*. §§ 18.92; 18.81–82; 501.41. The ALJ's decision can be appealed to the Administrative Review Board, *id*. § 501.42, a multimember board of adjudicators appointed by the Secretary of Labor, *Willy v. Admin. Rev. Bd*., 423 F.3d 483, 491 (5th Cir. 2005). The Secretary may also personally review the Board's decision. *Secretary's Order 01-2020—Delegation of Authority and Assignment of Responsibility to the Administrative Review Board*, 85 Fed. Reg. 13,186, 13,188

(Mar. 6, 2020). The Secretary's imposition of penalties may be subject to judicial review to determine whether it is authorized by statute, supported by substantial evidence, and consistent with due process. *See, e.g.*, 29 C.F.R. §§ 501.42(a), 501.33(a) (both referencing "judicial review"); *see also Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335–36 (1932) (recognizing that actions of the Secretary in imposing civil penalties may be subject to judicial review); 5 U.S.C. § 704.

More than 298,000 visas were issued to temporary workers under the H-2A program in fiscal year 2022. Andorra Bruno, Congressional Research Service, H-2A and H-2B Temporary Worker Visas: Policy and Related Issues app. at 29 (2023). Because of the important role that the H-2A program plays in immigration, the H-2A program is carefully monitored by the Secretary of Homeland Security and the Secretary of State, who determine which countries are eligible to participate in the program. *See Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H- 2B Nonimmigrant Worker Programs*, 88 Fed. Reg. 77,343, 77,343-44 (Nov. 9, 2023). In making these determinations, the Secretaries consider how a foreign country cooperates with the United States when its nationals are subject to removal, how many removal orders concern that country's nationals, and "other factors as may serve the U.S. interest." 8 C.F.R. § 214.2(h)(5)(i)(F)(1). Consistent with those immigration and foreign policy concerns, H-2A visas may not be issued to foreign workers from Cuba, Iran, and Russia, but may be issued to workers (for example) from Chile, Italy, and New Zealand, among other countries. *See* 88 Fed. Reg. at 77345-46.

## II. Procedural History

Plaintiff alleges that it is engaged in specialty crop farming, and, for many years, has employed foreign workers through the H-2A agricultural visa program, which enables

7

agricultural employers to supplement their workforce on a seasonal basis when there is a demonstrated lack of available U.S. labor. *See* Am. Compl. ¶ 8, Dkt. No. 10. On August 10, 2023, the Department of Labor, Wage and Hour Division, issued to Plaintiff a Notice of Determination of Wages Owed, Civil Money Penalties, and Debarment. Pl.'s Ex. A to the Am. Compl., Dkt. No. 10-1. As explained in the Notice, an investigation conducted by the Wage and Hour Division disclosed that Plaintiff failed to comply with Section 218 of the Immigration and Nationality Act and applicable H-2A regulations. *Id*. at 1.

The Wage and Hour Division Determination Notice documented numerous wage violations, including failure to pay the required wages for all hours worked, failure to comply with the transportation and daily subsistence requirements for travel to and from the place of employment, failure to comply with requirements regarding deductions from pay, failure to comply with the frequency of pay requirement, and receiving payment from employees for an activity related to obtaining the H-2A labor certification. *Id.* at 5-6. The Wage and Hour Division further documented violations relating to providing fraudulent pay records, failure to cooperate with the investigation, intimidating or threatening workers who engaged in protected activity, offering terms and working conditions to U.S. workers that were less favorable than those offered to H-2A workers, and failure to provide housing that complies with the applicable housing safety and health standards, among other things. *Id.* at 5-8. The Wage and Hour Division determined that 102 workers were owed back wages in the amount of $368,123.58 and assessed civil monetary penalties in the amount of $511,904.70. *Id.* at 1. As a consequence of the violations committed, the Wage and Hour Division determined that Plaintiff should be debarred from applying to the Department of Labor for H-2A certification for a period of three years. 29 C.F.R. § 501.20; Dkt. No. 10-1 at 2. The Determination Notice explained that Plaintiff

had the right to appeal the determination by requesting a hearing within 30 days. Dkt. No. 10-1 at 3.

On September 8, 2023, Plaintiff responded to the Wage and Hour Division's Determination Notice by requesting a hearing. Pl.'s Ex. B to the Am. Compl., Dkt. No. 10-2. On January 10, 2025, the matter was referred to the Department's Office of Administrative Law Judges (OALJ) for a hearing. Pl.'s Ex. C to the Am. Compl., Dkt. No. 10-3. OALJ docketed the case on January 27, 2025, Pl.'s Ex. D to the Am. Compl., Dkt. No. 10-4, and it was assigned to ALJ Paul R. Almanza on February 4, 2025, Pl.'s Ex. E to the Am. Compl., Dkt. No. 10-5. ALJ Almanza initially scheduled a hearing for March 11, 2025. *Id.*[2]

On February 7, 2025, Plaintiff filed a demand for a jury trial, arguing that "[t]he Seventh Amendment to the U.S. Constitution [] guarantees Respondent a jury trial regarding an agency's allegations of violations and assessment of civil money penalties." Pl.'s Ex. F to the Am. Compl., Dkt. No. 10-6 at 2 (citing *Jarkesy*). In its demand for a jury trial, Plaintiff noted that the Department of Labor's regulations are silent on whether a jury trial may be demanded in response to a Wage and Hour Division Notice of Determination. *Id.* On March 10, 2025, the ALJ denied Plaintiff's demand for a jury trial, ruling that the ALJ "must adjudicate this matter in accordance with the H-2A regulations, which do not provide for a jury trial." Pl.'s Ex. H to the Am. Compl.; Dkt. No. 10-8 at 1. Additionally, the ALJ stated he lacked the authority to consider the constitutionality of the Immigration and Nationality Act and the applicable implementing regulations. *Id.*

On March 20, 2025, Plaintiff requested an order from the ALJ certifying the following

---

[2] The March 11, 2025 hearing was later cancelled pursuant to a February 27, 2025 order issued by the ALJ that stated that a hearing date would be set, if necessary, after the ALJ ruled on Plaintiff's jury demand. Pl.'s Ex. G to the Am. Compl., Dkt. No. 10-7 at 2.

"controlling question of law" for interlocutory appeal to the Department's Administrative Review Board: "Whether Respondent's Seventh Amendment jury trial protection and the Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) apply to this Wage and Hour Division enforcement matter." Pl.'s Ex. I to the Am. Compl.; Dkt. No. 10-9 at 3. On April 14, 2025, the ALJ denied Plaintiff's request for an order certifying a controlling question of law for interlocutory review on grounds that "an immediate appeal would not materially advance the termination of this litigation" as the Board had already denied interlocutory review of this question in another case. Pl.'s Ex. J to the Am. Compl.; Dkt. No. 10-10 at 2–3.

On May 2, 2025, Plaintiff filed the Complaint in this case, challenging the Department's administrative proceedings as a violation of the Seventh Amendment right to jury trial, a violation of Article III and the separation of powers, a violation of due process under the Fifth Amendment, and unlawful under the Administrative Procedure Act. Dkt. No. 1. After receiving Plaintiff's Notice of Filing, the ALJ issued an order to show cause as to why the administrative proceedings should not be held in abeyance until this Court decides whether the administrative matter can proceed. Pl.'s Ex. J to the Am. Compl., Dkt. No. 10–11. On June 18, 2025, the ALJ declined to hold the administrative proceedings in abeyance, finding that the Immigration Nationality Act and the applicable regulations provide that a hearing may be held on the Wage and Hour Division's determination, Plaintiff timely exercised its right to request a hearing, and thus "unless or until the U.S. District Court for the District of South Carolina rules on [Plaintiff's] complaint, this matter will continue to proceed before me in accordance with statutory and regulatory requirements." Pl.'s Ex. K to the Am. Compl., Dkt. No. 10-12 at 2. The ALJ scheduled the administrative hearing for November 5–6, 2025. *Id.* at 2.

Plaintiff filed an amended complaint on July 6, 2025, Dkt. No. 10, and on July 18, 2025,

Plaintiff filed its Motion for a Temporary Restraining Order and Preliminary Injunction in this matter. Pl.'s Mot. and Mem., Dkt. Nos. 15, 15-1.

## LEGAL STANDARDS

The substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same. *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 465 (D.S.C. 2020). Both "are intended to meet exigent circumstances[.]" *Id.* (citing *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982)). It "is an extraordinary remedy never awarded as of right." *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he party seeking [either of these types of relief] must prove [its] own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which [it] bases the right to and necessity for injunctive relief." *Id.* (citing *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980)).

A temporary restraining order or a preliminary injunction should issue only when the plaintiff establishes "the four so-called *Winter* factors": first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The burden is on the party seeking injunctive relief to show it is entitled to the relief, not the burden of the other party to show the movant is not entitled. *S.C. Progressive Network*, 493 F. Supp. 3d at 465 (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 443 (1974)).

The movant must satisfy all four factors to obtain preliminary injunctive relief, and "a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors." *Viktus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). In other words, "[a temporary restraining order or a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

## ARGUMENT

### I.     Plaintiff cannot establish any likelihood of success on the merits.

Plaintiff's claims fail as a matter of law and lack merit. Thus, Plaintiff cannot establish any likelihood of success on the merits and is not entitled to a temporary restraining order or a preliminary injunction. The Supreme Court has long held and recently reiterated that Congress' "plenary power over immigration" concerns matters of public rights that can be constitutionally adjudicated within the Executive Branch. *Jarkesy*, 603 U.S. at 129 (citing *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 331–34 (1909)). Thus, Congress acted well within its constitutional bounds by enacting the H-2A visa program to regulate the entry of foreign nationals into the United States for limited purposes, for limited times, under certain conditions, and ensuring compliance through administrative adjudication. Plaintiff voluntarily availed itself of the benefits of this scheme by importing and hiring foreign laborers to work on its behalf. And when Plaintiff violated the requirements that it had agreed to adhere to under the H-2A program, the Department of Labor carried out its enforcement role, as directed by Congress, using a process by which an ALJ, not a jury, adjudicates violations and imposes penalties. The administrative proceedings do not offend either the Seventh Amendment, Article III, or the Due Process Clause and are entirely consistent with the Administrative Procedure Act.

12

### A.  Congress constitutionally regulated agricultural work by foreign nationals and authorized the Secretary of Labor to adjudicate violations.

The importation of foreign labor is subject to a reticulated statutory and regulatory scheme, consistent with Congress' plenary authority to regulate immigration and to oversee work performed by foreign nationals that operates in conjunction with the domestic labor force. And the Department of Labor, following an investigation, charged Plaintiff with violations of the statutory and regulatory requirements for the H-2A visa program. Those violations are lawfully subject to the administrative adjudication process. Nonetheless, Plaintiff mistakenly asserts that because a claim for unpaid wages resembles a common law breach of contract claim and the remedies sought by the Department are all purportedly "legal in nature," these violations can only be adjudicated by a jury. Plaintiff misunderstands the nature of Congress' "broad, undoubted power over the subject of immigration," arising both from the Constitution and Congress' "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012).

The Constitution vests Article III courts with the judicial power of the United States, while simultaneously authorizing adjudications of non-Article III matters by the Executive Branch. Thus, the first Congresses tasked the Secretary of War with adjudicating whether veterans of the Revolutionary War were entitled to military pensions, see Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 CASE W. RESERVE L. REV. 1083, 1089–90 (2015), and directed federal collection officers to adjudicate and enforce payment of customs duties, Act of July 31, 1789, ch. 5, §§ 3-5, 1 Stat. 29, 36–37 (1789). "[S]ince the beginning of the Republic," executive officials have "conduct[ed] adjudications," which may take "'judicial' forms" but are ultimately "exercises of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1. cl. 1).

13

In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Services, LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation omitted). But for public rights, "the mode of determining matters . . . is completely within congressional control," and Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to the judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (citation omitted).

The Supreme Court has not "definitively explained" the difference between public and private rights, but its "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States*, 584 U.S. at 334 (first quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982); then quoting *Crowell*, 285 U.S. at 50). That includes Congress' "plenary power over immigration," which squarely falls within the public rights doctrine. *Jarkesy*, 603 U.S. at 129. Decisions concerning the admittance and removal of noncitizens, and the regulation of noncitizens' work within the United States may be carried out by "the executive or legislative departments" without "judicial determination." *Crowell*, 285 U.S. at 50–51 (identifying immigration decisions as a "[f]amiliar illustration" of public rights). So long as "Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States*, 584 U.S. at 345 (internal quotation marks omitted).

**B.  Receiving federal permission to hire and import foreign nationals to work within the United States is a matter of public rights.**

14

The United States "has broad, undoubted power over the subject of immigration and the status of aliens" derived from both the Constitution and "its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394–95. Immigration policy affects "trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id*. at 395. And "mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id*.

The Supreme Court has long recognized that the Executive Branch may administer immigration laws like the H-2A program and may—within the statutory bounds authorized by Congress—impose money fines for violations of those laws. In *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. at 330, the Supreme Court considered an Act that prohibited immigration of people with "a dangerous contagious disease," or who had previously agreed "to perform labor or service of any kind, skilled or unskilled." Pursuant to the Act's authority, the Secretary of Commerce and Labor assessed a money penalty against a steamship company that had brought infected immigrants into the country. *Id*. at 329. The company then sued to regain the money it had paid, arguing that the statute was unconstitutional because it allowed the Secretary to impose a money penalty without "resorting to the judicial power." *Id*. at 338.

The Supreme Court rejected that argument, explaining that Congress may "legislat[e] as to matters exclusively within its control," may "impose appropriate obligations," and "sanction their enforcement by reasonable money penalties," granting "executive officers the power to enforce such penalties without the necessity of invoking the judicial power." *Oceanic Steam Navigation*, 214 U.S. at 339. Because Congress' authority over immigration "embraces every conceivable aspect of that subject" then Congress may constitutionally "impose particular restrictions" and

15

authorize "penalties enforceable by administrative authority." *Id*. at 340. In light of that "plenary power" to control "the admission of aliens," there was "no room for doubt as to [Congress'] authority to impose the penalty." *Id*. at 343.[3]

The Supreme Court reiterated that conclusion in *Jarkesy*, 603 U.S. 109. There, the Court held that the Securities and Exchange Commission could not administratively impose money penalties for certain securities fraud violations because the relevant statutes "replicate common law fraud," and those essentially "common law claims must be heard by a jury." *Id*. at 120. Further, the Court found that the securities laws claims did "not fall within any of the distinctive areas involving governmental prerogatives" that allow for administratively imposed money penalties. *Id*. As part of that analysis, the Court explicitly distinguished the securities laws from "Congress's power over foreign commerce" that it considered in *Oceanic Steam Navigation*, which "was so total that no party had a vested right to import anything into the country." *Jarkesy*, 603 U.S. at 129 (quoting *Oceanic Steam Navigation*, 214 U.S. at 335). And under that reasoning, "Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." *Id*.

While the outer bounds of the public rights doctrine are still not sharply delineated, *Jarkesy*, 603 U.S. at 130–31, "'[r]epeated decisions of [the] court have determined that Congress has the power to exclude aliens from the United States; to prescribe the terms and conditions on which they may come in … and to commit the enforcement of such conditions and regulations to executive officers … and that the provisions of the Constitution securing the right of trial by jury have no application.'" *Oceanic Steam Navigation*, 214 U.S. at 334-35, 339 (quoting *United States*

---

[3] As explained above, the Secretary's imposition of penalties is still, of course, subject to judicial review to determine whether it is authorized by statute, supported by substantial evidence, and consistent with due process. *Lloyd Sabaudo Societa Anonima Per Azioni*, 287 U.S. at 335.

*ex rel. Turner v. Williams*, 194 U.S. 279, 289–90 (1904)); *accord Jarkesy*, 603 U.S. at 129–30; *Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*, 430 U.S. 442, 456 (1977) (explaining that adjudications involving immigration are "public rights [that] may be assigned to administrative agencies").

That is true even when Executive adjudication might seem to touch upon common law issues, such as whether a noncitizen "did not enter her marriage in good faith," *Elgebaly v. Garland*, 109 F.4th 426, 434 (6th Cir. 2024)—such issues still concern adjudications of "public rights" that can "be conducted by the executive branch." *Id*. at 437. *Cf. Trump v. United States*, 603 U.S. 593, 607 (2024) (describing "matters related to . . . immigration" as among the President's "important foreign relations responsibilities").

The H-2A visa program is an undisputed exercise of Congress' constitutional authority to regulate the entry of foreign nationals into the United States and to control the method by which those noncitizens perform work within the Nation's borders. Congress codified the program as part of the Immigration and Nationality Act of 1952, and further refined the program when enacting the Immigration Reform and Control Act of 1986. *See La. Forestry Ass'n*, 745 F.3d at 659; *USA Farm Labor*, 2025 WL 586339, at *2. The purpose of the 1986 Act was to "close the back door on illegal immigration so that the front door on legal immigration may remain open." *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999) (quoting H.R. Rep. No. 99-682, at 46 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5649–50). Because Congress "believed that '[e]mployment is the magnet that attracts aliens here illegally,'" it prohibited employers from knowingly hiring "an unauthorized alien to work in the United States," *id*. (alteration in original) (first quoting H.R. Rep. No. 99-682(I) at 46, then citing 8 U.S.C. § 1324a), while simultaneously re-codifying and refining the H-2A visa program to ensure lawful avenues for foreign nationals to

17

work in U.S. agriculture subject to certain conditions.

The H-2A program thus "provide[s] agricultural employers with an orderly and timely flow of legal workers," which "decreas[es] their reliance on unauthorized workers." *Changes to Requirements Affecting H-2A Nonimmigrants,* 73 Fed. Reg. 76,891, 76,891 (Dec. 18, 2008). In administering the program, Congress entrusted the Executive Branch to "maintain the careful balance between preserving jobs for U.S. workers" while appropriately "invit[ing] foreign workers to the United States" to perform much-needed work. *Id*. at 76,895. Consistent with those goals for the H-2A program, Congress required the Department of Labor to certify that there are not sufficient workers to perform the work specified in the employer's petition to hire foreign workers, and that the pay and work conditions offered to foreign workers would not "adversely affect" workers in the U.S. 8 U.S.C. § 1188(a)(1). This requires, in turn, that employers who elect to participate in the H-2A program must provide assurances that they will "offer to provide benefits, wages and working conditions" as established by regulation, 8 U.S.C. § 1188(c)(3)(B)(i), "furnish housing in accordance with regulations," *id*. § 1188(c)(4) , and comply with "the criteria for certification," including the Secretary's regulations, *id*. § 1188(c)(3)(A)(i), which include minimum standards for pay, housing, transportation, and meals, 20 C.F.R. § 655.122.

Other aspects of the H-2A program ensure that foreign nationals remain in the United States only for their approved period of agricultural work. Employers must notify workers of their duty to leave the United States after completing the contract, 20 C.F.R. § 655.135(i), must provide or pay for workers' outbound transportation, *id.* § 655.122(h)(2), and must notify the United States if a foreign worker fails to report to work, absconds from the worksite, is fired, or if the work is completed substantially earlier than anticipated, *id.* § 655.122(n); 8 C.F.R. § 214.2(h)(5)(vi)(B). These requirements "ensure that the workers timely depart the U.S. without risking negative

18

immigration consequences for overstays of their" visas, while simultaneously ensuring that "employers are aware that they may not offer employment to foreign workers which exceeds the period certified" under the H-2A work period. *Temporary Agricultural Employment of H-2A Aliens in the United States*, 74 Fed. Reg. 45,906, 45,918 (Sept. 4, 2009).

Moreover, the United States has long used the H-2A program as one way to conduct international relations with other sovereigns, authorizing participation by countries when it "may serve the U.S. interest" and admitting nationals from non-eligible countries when "it is in the U.S. interest for that alien to be a beneficiary of" the program. 8 C.F.R. § 214.2(h)(5)(i)(F)(1)(i)-(ii). Thus, the government considers a variety of foreign policy concerns in excluding other nations from participation in the H-2A program—for example, countries have been excluded because they failed to adequately prevent human trafficking, they abused the H-2A program, or they insufficiently cooperated "in accepting back their nationals that have been ordered removed from the United States." *Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 83 Fed. Reg. 2,646, 2,647 (Jan. 18, 2018); *see also Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 86 Fed. Reg. 2,689, 2,690-91 (Jan. 13, 2021) (similar); *Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 86 Fed. Reg. 62,559, 62,561 (Nov. 10, 2021) (similar). And the U.S. has authorized participation in the H-2A program by countries that were previously excluded when doing so advances U.S. foreign policy interests. For example, Haiti was reauthorized to participate in the program, in part, because Haitians would "not only contribute to the U.S. economy, but [would] also apply their earnings and technical experience to advance Haiti's reconstruction and stabilization," which "is vital to the interests of the

19

United States as a close partner and neighbor." 86 Fed. Reg. at 62,562.

In all these ways, the function and purpose of the H-2A visa program concerns the United States' sovereign interests in regulating employer-sponsored immigration, overseeing domestic work performed by foreign nationals, and managing diplomatic relations with foreign sovereigns. For that reason, all the opinions (including concurring and dissenting opinions) in *Jarkesy* separately reaffirmed that Congress exercises complete control over immigration, and within that area "administrative officers should have the authority to enforce designated penalties without resort to the courts." *Jarkesy*, 603 U.S. at 129 n.1 (quoting *Oceanic Steam Navigation*, 214 U.S. at 339); *id*. ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals."). Given "Congress's long-recognized and extensive authority over the field of immigration," regulation of immigration has thus been "traditionally included" within the core of public rights, *id*. at 152, 160 (Gorsuch, J., concurring), and a "civil-penalty statutory scheme" for immigration violations is "beyond all question constitutional," *id*. at 176 (Sotomayor, J., dissenting) (quoting *Oceanic Steam Navigation*, 214 U.S. at 342).

Plaintiff's contrary arguments rest on mistaken premises. Plaintiff erroneously asserts that the Court can rule in its favor on the Seventh Amendment claim because the "wage-related violations" that it is accused of "are legal in nature" and "analogous to a common law breach of contract action," and that, under South Carolina state law, contract claims are "actions at law" that are "within the province of a jury." Pl.'s Mem. at 13–14, Dkt. No. 15-1. Plaintiff also attempts to analogize the H-2A wage-related violations to statutory unpaid wages claims under South Carolina wage-payment law and the Fair Labor Standards Act's statutory wage protections, arguing that these claims are "actions at law" and subject to the Seventh Amendment jury trial right. *Id.* at 14–

15. But Plaintiff cannot establish a jury trial right simply by attempting to analogize its violations to a breach of contract and other statutory rights. The mere fact that a violation of immigration laws might be compared to a common-law claim or a statutory claim that is a claim "at law" does not place it outside of Congress' authority to regulate immigration and require Article III jurisdiction in the first instance. Forgery may be likened to common-law claims—but forging documents to demonstrate that a foreign national may legally work within the United States concerns "the public right to regulate immigration." *Noriega-Perez*, 179 F.3d at 1177 (upholding civil penalties under 8 U.S.C. § 1324c). Regulating the "unlawful employment of" noncitizens is "an important aspect of U.S. immigration law," and the courts have "long recognized that the power to exclude alien laborers is a 'matter of public rights.'" *Id.*

Likewise, entering into a fraudulent marriage to deceive another might share aspects of common-law fraud, but it still concerns the United States' distinctly sovereign interests in admitting noncitizens based on a marriage "not contracted for the purpose of evading" the immigration laws. 8 U.S.C. § 1227(a)(1)(G)(i). A surface-level comparison to common-law claims does not transform immigration matters into private rights. *Malik v. Attorney General*, 659 F.3d 253, 257–58 (3d Cir. 2011) (upholding order of removal based on executive determination that noncitizen "entered into a fraudulent marriage").

Plaintiff next argues that all of the remedies sought here are "legal in nature" such that the Seventh Amendment jury trial right attaches. Pl.'s Mem. at 16–19. Plaintiff argues that both the civil money penalties and debarment are legal remedies because they are designed to "punish or deter the wrongdoer," and that the unpaid wages are also legal rather than equitable, and thus the remedies are "all but dispositive" in favor of its Seventh Amendment claim. *Id.* at 15–18 (quoting *Jarkesy*, 144 S. Ct. at 2129). But that misreads *Jarkesy*, which explained, for example, that the

presence of punitive civil penalties was "all but dispositive" of whether a matter concerns legal claims that implicate the Seventh Amendment. 603 U.S. at 123. That inquiry, however, is distinct from the question of whether a case involves public rights, including the quintessential public right to regulate immigration and to impose civil penalties for violations of the immigration laws. *Id*. at 127–29. The mere existence of legal remedies does not transform a matter of public rights into a matter of private rights.

But more fundamentally, no U.S. employer has a private, common law right to bring foreign nationals into the United States to work. This is not "the stuff of the traditional actions at common law tried by the court at Westminster in 1789." *Jarkesy*, 603 U.S. at 128 (citation omitted). Plaintiff is allowed to import and hire foreign laborers solely because Congress has enacted a statutory scheme to permit such activity under strictly controlled circumstances (consistent with Congress' plenary authority to control immigration). Within that administration of public rights, Congress has directed the Executive to "administer[] a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Thomas v. Union Carbide Agric. Prods. Co*., 473 U.S. 568, 589 (1985).

In the H-2A visa program, Congress chose to admit certain foreign nationals, on certain terms, to engage in certain work, for a limited time, subject to specified requirements for wages, benefits, and work conditions to preserve the domestic labor force and to further U.S. foreign policy interests. The scheme reflects Congress' deliberate effort "to balance the competing goals of the statute" by "protecting the jobs of domestic workers" on one hand while also increasing the supply of "documented foreign workers" on the other. *AFL-CIO v. Dole*, 923 F.2d 182, 186–87 (D.C. Cir. 1991). Plaintiff chose to avail itself of that program and to access foreign workers it could not hire otherwise, and the workers themselves could not otherwise enter the U.S. absent

22

an independent basis for admission. When Plaintiff violated the terms of that scheme, it undermined the choices—made by the politically accountable branches—about how foreign laborers may be permitted to work within the United States.

The H-2A program is fundamentally an exercise of "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1823 (2024). That is why President Reagan—in signing the 1986 amendments that codified the current H-2A visa program—explained that the Act "preserves and enhances the Nation's heritage of legal immigration" while simultaneously taking "a major step toward meeting th[e] challenge" of unlawful immigration that affects "our sovereignty." Statement On Signing the Immigration Reform and Control Act of 1986, 2 Pub. Papers 1522, 1522 (Nov. 6, 1986).

Plaintiff is mistaken in suggesting that the United States' sovereign interests in regulating immigration are limited to "dispute[s] about whether an alien may be admitted or excluded" from the U.S. at the border or ports of entry, as opposed to violations that may occur "weeks or months after the individual lawfully entered the United States." Pl.'s Mem. at 21. To the contrary, it is a "fundamental proposition[]" that the United States' "plenary authority" over immigration includes the "concomitant" authority "to set the procedures to be followed" governing admission, regardless of whether the person is already "on U.S. soil." *Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020). Plaintiff does not seriously dispute that the United States may impose civil penalties on noncitizens already within the country for immigration violations. *See, e.g.*, *Velasquez-Tabir v. INS*, 127 F.3d 456, 457–58 (5th Cir. 1997) (per curiam) (upholding civil penalty against foreign national who presented his employer with a falsified green card); *Remileh v. INS*, 101 F.3d 66, 67 (8th Cir. 1996) (per curiam) (similar). And the immigration laws apply equally to those who employ foreign nationals within the Nation's borders. *Villegas-Valenzuela v.*

*INS*, 103 F.3d 805, 808 (9th Cir. 1996).

Consistent with that understanding, Congress has enacted many statutes that involve executive adjudication of immigration laws—including, where necessary, civil penalties—based on activities occurring within the Nation's borders. *See, e.g.*, 8 U.S.C. § 1184(c)(14)(A)(i) (an employer may not make willful misrepresentations or substantially fail to comply with the terms of a petition to import foreign nationals under the H-2B visa program); *id.* § 1182(n)(2)(C) (employers petitioning the government to allow foreign nationals to work under an H-1B visa may not substantially fail to meet the required conditions, and penalties will be increased for willful misrepresentations); *id.* § 1324a(a)(1)–(2), (e)(4) (employers may not knowingly hire or continue to employ a noncitizen who is not authorized to work in the United States.); *id.* §§ 1183, 1183a(d) (sponsors who support the admittance of foreign nationals under a "suitable and proper bond" must inform the Attorney General if they change address); *id.* § 1288(c)(4)(E) (civil penalties for failure to meet or for misrepresenting requirements for noncitizens to perform longshore work at U.S. ports); *id.* § 1375a(d)(1), (5) (civil penalties for international marriage brokers who market to children). These enforcement measures—many of which include other remedies such as back wages, which Plaintiff erroneously claims "do not implicate the 'public rights exception,'" Pl.'s Mem. at 21, are all exercises of the United States' sovereign authority to regulate lawful admission into the country and work by noncitizens. And they are therefore public rights that Congress can constitutionally assign "to executive officers," *Crowell*, 285 U.S. at 50, regardless of whether immigration violations occur at the border or within it, by noncitizens or by domestic employers of foreign workers.

**C. Plaintiff cannot show a likelihood of success on the merits of its Fifth Amendment Due Process Clause claim.**

Plaintiff claims that Justice Gorsuch's concurring opinion in *Jarkesy* supports the

24

proposition that there is a separate due process right to "an independent judge and a jury" in addition to procedural protections that "courts supply in cases where a person's life, liberty, or property is at stake." Pl.'s Mem. at 21 (citing *Jarkesy*, 144 S. Ct. at 2141 (Gorsuch, J., concurring)). Plaintiff cites no authority that relies on Justice Gorsuch's concurrence to arrive at this result. Moreover, this is a misreading at best that ignores Justice Gorsuch's discussion of the immigration public rights exception, which applies here.

Justice Gorsuch explained how Fifth Amendment due process principles interact with both Article III and the Seventh Amendment. *See, e.g.,* 603 U.S. at 141 ("The Seventh Amendment guarantees the right to trial by jury. Article III entitles individuals to an independent judge who will preside over that trial. And due process promises any trial will be held in accord with time-honored principles."). Justice Gorsuch also explained, however, that "under the public rights exception, Congress may allow the Executive Branch to resolve certain matters free from judicial involvement in the first instance." *Id.* at 152. He elaborated that "public rights are a narrow class defined and limited by history …. [T]hat class has traditionally included the collection of revenue, customs enforcement, *immigration*, and the grant of public benefits." *Id.* at 152–53 (emphasis added). More specifically, Justice Gorsuch explained that the Due Process Clause "sets customary common-law practice as the ordinary procedural baseline," but "historical evidence of a different practice might warrant a departure from that baseline." *Id.* at 153–54. He described just such a historical practice for immigration matters, noting "Congress's long-recognized and extensive authority over the field of immigration," and explained that "what links immigration to other public rights . . . is that, 'from the beginning, Congress has exercised a plenary power over them because they all relate to subjects peculiarly within the authority of the legislative department.'" *Id.* at 160–61 (quoting *Oceanic Steam Navigation*, 214 U.S. at 334, 339) (additional internal quotation marks

omitted). Thus, the Due Process Clause does not "demand" an "independent judge or jury" in this case, nor does it "require" an "impartial fact finder" who is outside the Department of Labor, Pl.'s Mem at 22, because this is an immigration matter involving public rights that can be adjudicated by the agency without a jury.

Moreover, "[i]t is well established that due process rights are not violated simply by the combination of the investigative, prosecutorial, and adjudicative functions in one agency." *Marshall v. Cuomo*, 192 F.3d 473, 484 (4th Cir. 1999). An administrative adjudicator, like a judicial decisionmaker, is "entitled to a 'presumption of honesty and integrity.'" *Morris v. City of Danville*, 744 F.2d 1041, 1044 (4th Cir. 1984) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). A party arguing that "the combination of investigative and adjudicative functions . . . creates an unconstitutional risk of bias in administrative adjudication" must carry a "difficult burden of persuasion," showing sufficient evidence to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. Plaintiff in no way overcomes that significant hurdle here.

Further, the proceedings before the Department's OALJ provide numerous procedural protections to litigants, including motions to dismiss, 29 C.F.R. § 18.70(c), the ability to take discovery, *id.* §§ 18.50-.65, and the equivalent to motions for summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* §§ 18.92, 18.81-.82, 501.41. The Federal Rules of Civil Procedure also apply to proceedings before an ALJ in any situation not provided for or controlled by the governing statute or applicable regulations. *Id.* § 18.10(a). Thus, the proceedings provide more than adequate notice and opportunity to be heard to comport with due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Crowell*, 285 U.S. at

26

45–48.

Plaintiff also contends that, under the *Accardi* doctrine, there was a "degradation of procedural protections" that rises to the level of a due process violation because certain timeframes in the Department's regulations governing administrative proceedings were not strictly adhered to, in its view. Pl.'s Mem. at 23–24 & n.7 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–67 (1954)). Plaintiff's reliance on the *Accardi* doctrine is misplaced. The *Accardi* doctrine generally "bars administrative agencies from taking action inconsistent with their internal regulations when it would affect individual rights." *United States v. Lee*, 274 F.3d 485, 492 (8th Cir. 2001) (internal quotation marks omitted). However, the application of the *Accardi* doctrine rests on the granting of "legally enforceable rights," which Plaintiff cannot show here. *See Samirah v. Holder*, 627 F.3d 652, 664 (7th Cir. 2010). Plaintiff points to language in the H-2A regulations, 29 C.F.R. § 501.37, stating that the Department "will, by Order of Reference, promptly refer" the determination notice and hearing request to the OALJ. Plaintiff also points to language providing that a hearing "shall not be more than 60 calendar days from the date on which the Order of Reference was filed." 29 C.F.R. § 501.38. But rather than affording rights to H-2A employers, these provisions are simply designed to avoid delay. General principles permit administrative agencies to relax or modify their procedural rules "adopted for the orderly transaction of business" when justice so requires. *Am. Farm Lines v. Black Ball Freight Serv*., 397 U.S. 532, 539 (1970). Where a procedural rule was "not intended primarily to confer important procedural benefits upon individuals," a complaining party must demonstrate substantial prejudice for a court to bar an agency from acting outside its own deadlines. *Id.* at 538. Because Plaintiff cannot demonstrate a

right to which it was entitled related to the regulatory deadlines, it cannot establish substantial prejudice.[4]

Moreover, in *Brock v. Pierce County*, 476 U.S. 253, 259–60 (1986), the Supreme Court addressed the implications of statutory term "shall" in the context of whether the Secretary of Labor was deprived of "jurisdiction" because of her failure to meet a 120-day statutory deadline in the Comprehensive Employment and Training Act directing that the Secretary "shall" make a determination within that period. The *Pierce County* Court held that, unless a statute requiring that agency action occur within a particular time frame also incorporates a consequence for failure to comply with that time requirement, the "mere use of the word 'shall'" in that time requirement is not enough to divest the Agency of authority to act after the deadline passes." *Id.* at 260–62, 265; *see Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 199–200 (3d Cir. 2010) (applying *Pierce County* to H-1B regulatory time limits and holding that the Secretary's failure to meet a regulatory deadline did not deprive the Secretary of jurisdiction to impose sanctions for the employer's H-1B violations). Similarly, as the H-2A regulations do not include any consequence for failure to comply with a time requirement, Plaintiff is unable to show any mandatory requirements that would form the basis of a due process violation if not followed.

---

[4] Defendants do not concede that the Department acted outside the deadlines in its procedural regulations. Consistent with the 60-day regulation, the ALJ did initially set the hearing date for March 11, which was 60 days from January 10, the date on which the Order of Reference was filed. However, after Plaintiff filed its jury demand on February 7, the ALJ reasonably cancelled the hearing date, explaining that he would set a hearing date, if necessary, after ruling on Plaintiff's jury demand. Pl.'s Ex. G to the Am. Compl., Dkt. No. 10-7 at 2. In the subsequent time period, the parties continued to engage in discovery and the parties responded to the ALJ's orders to show cause, and Plaintiff filed additional requests that the ALJ adjudicated. Rather than being a strict requirement, the 60-day regulation would need to at least be read in conjunction with, for example, 29 C.F.R. § 18.12, which provides that ALJs have the power to "[r]egulate the course of proceedings." And a fifteen-month time period between the hearing request and the filing of the order of reference does not necessarily contravene the word "promptly," a non-definitive time parameter.

**D. Plaintiff's APA claims are duplicative of its Seventh Amendment and Due Process claims, and Plaintiff likewise lacks any likelihood of success on the merits on these claims.**

Plaintiff's first APA claim is premised on the assertion that, in failing to provide a jury trial, the ALJ acted "contrary to constitutional right, power, privilege, or immunity." Pl.'s Mem. 24–25 (quoting 5 U.S.C. § 706(2)(B)). Plaintiff's second APA claim contends that because the Department's H-2A regulations do not "recognize Del Valle Fresh's constitutionally guaranteed rights" to due process protections and a jury trial in an Article III court, the Department's regulations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," as is the Department's purported deprivation of Plaintiff's rights by "compelling" Plaintiff to participate in the administrative proceeding. Pl.'s Mem. 26 (quoting 5 U.S.C. § 706(2)(A)). Finally, Plaintiff's third APA claim is premised on the same assertions, which purportedly violate the APA because they are "without observance of procedure required by law." Pl.'s Mem. 26–27 (quoting § 706(2)(D)).

Because Plaintiff is incorrect that *Jarkesy*, the Seventh Amendment, the Due Process Clause, or Article III require a jury trial in the administrative proceedings or in an Article III court, Plaintiff is likewise incorrect that failing to provide a jury trial violates the APA. In codifying the H-2A visa program, Congress provided that the Secretary of Labor "is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section." 8 U.S.C. § 1188(g)(2); *see* 8 U.S.C. § 1188(b)(2)(A) (providing the Secretary of Labor authority to debar an employer from the H-2A program (by not issuing a labor certification) where the employer "substantially violated a material term or condition of the labor application"). The

29

statute, on its face, authorizes the Secretary to impose civil penalties and take other necessary actions, and Congress instructed the government to promulgate implementing regulations within seven months. IRCA, § 301, 100 Stat. at 3416. Accordingly, the Secretary proposed and issued regulations to provide for a hearing and secretarial review of actions to "assess civil money penalties" and "recover unpaid wages." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act*, 52 Fed. Reg. 16,795, 16,796-97 (May 5, 1987); 52 Fed. Reg. at 20,526-27. The substance of those regulations has remained in place since their promulgation. 29 C.F.R. §§ 501.15-.47. For the reasons discussed above, Congress acted within its plenary authority to regulate immigration in enacting the H-2A program and tasking the Secretary of Labor with ensuring program compliance, including through penalties and other necessary actions. As such, a jury trial is not required in this matter of public rights.  Thus, Plaintiff's APA claim lacks any likelihood of success on the merits.

## II.    Plaintiff cannot establish irreparable harm.

Plaintiff's sole assertion of irreparable harm is that it is being subjected to "unconstitutional agency authority" in the form of "an illegitimate proceeding." Pl.'s Mem. 27–28 (citing *Axon Enter. Inc. v. F.T.C.*, 598 U.S. 175, 191-92 (2023)). Plaintiff relies exclusively on *Axon* in support of its argument that it has established irreparable harm if illegitimate administrative proceedings are not enjoined. *Id.* But Plaintiff misreads *Axon*, which "only upheld district court jurisdiction to consider collateral constitutional challenges to administrative proceedings" and does not "create[] an entitlement on the merits to a preliminary injunction in every case where such constitutional challenges are raised." *Leachco, Inc. v. Consumer Prod. Safety Comm'n,* 103 F.4th 748, 759 (10th Cir. 2024) (citing *Collins v. Yellen*, 594 U.S. 220 (2021)), *cert. denied*, 145 S. Ct. 1047 (2025).

The narrow jurisdictional question at issue in *Axon* has no bearing on whether Plaintiff has established irreparable harm, and the Supreme Court has never held that an *Axon* injury merits emergency relief. *See Meta Platforms, Inc. v. FTC*, No. CV 23-3562 (RDM), 2024 WL 1121424, *9–10 (D.D.C. Mar. 15, 2024) ("A 'here-and-now injury' [under *Axon*] is not, as [plaintiff] suggests, synonymous with an irreparable injury"), *appeal docketed*, 24-5054 (D.C. Cir. Mar. 15, 2024), *den. inj. pending appeal*, No. 24- 5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024). Courts interpreting *Axon* and *Collins* have been deliberate not to misunderstand the Supreme Court's pronouncements about jurisdiction in *Axon* as a holding that a party is automatically entitled to relief based on constitutional challenges to agency adjudications. *Leachco*, 103 F.3d at 759*; see also YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-12173, 2024 WL 4119058, at *14 (E.D. Mich. Sept. 9, 2024), *appeal docketed*, No. 24-1754 (6th Cir. Sept. 9, 2024), *den. stay pending appeal*, No. 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024), *den. appl.*, No. 24A348, 2024 WL 4508993 (U.S. Oct. 15, 2024). Plaintiff's irreparable harm arguments fail under this framework.

In fact, when faced with these arguments, some courts have concluded that merely being subject to a proceeding before an ALJ does not constitute irreparable harm sufficient to warrant preliminary relief. *See YAPP USA*, 2024 WL 4119058, at *14; *see also YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-1754, 2024 WL 4489598, at *2–3 (6th Cir. Oct. 13, 2024) (noting that *Axon* "only upheld district court jurisdiction to consider collateral constitutional challenges to administrative proceedings," and concluding that it is not "a broad ruling that creates an entitlement on the merits to a preliminary injunction in every case where such constitutional challenges are raised") (quoting *Leachco*, 103 F.4th at 759). As explained above, any decision by the ALJ is appealable to the Administrative Review Board. 29 C.F.R. § 501.42; *see also Willy v. Admin. Rev. Bd.*, 423 F.3d

31

483, 491 (5th Cir. 2005). The Secretary of Labor may also personally review the Board's decision, and any penalties imposed may also be subject to judicial review. 85 Fed. Reg. at 13,188; 29 C.F.R. §§ 501.42(a), 501.33(a) (both referencing "judicial review"); *Lloyd Sabaudo Societa Anonima Per Azioni*, 287 U.S. at 335 (identifying areas of judicial review while upholding the constitutionality of administrative penalties for immigration violations). Plaintiff has not demonstrated that a final agency order or, following judicial review, court decision, in its favor would fail to remedy any alleged harm incurred during the administrative proceeding. *Cf. Sampson v. Murray*, 415 U.S. 61, 91 (1974) (concluding that reputational damage from an agency's alleged failure to follow necessary procedures "would be fully corrected by an administrative determination requiring the agency to conform to the applicable regulations"). And the Supreme Court has rejected the argument "that the expense and disruption of defending [oneself] in protracted adjudicatory proceedings constitutes irreparable harm," even if the expense is "substantial" and "unrecoupable." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *see also Borden, Inc. v. FTC* 495 F.2d 785, 789 (7th Cir. 1974); *Martin Marietta Energy Sys., Inc. v. Martin*, 909 F. Supp. 528, 533 (E.D. Tenn. 1993).

Plaintiff's claims that the Department will suffer no irreparable harm if the administrative proceeding is delayed and that the Department has no interest in timely adjudication of Plaintiff's appeal, Pl.'s Mem. 28, are without merit. As discussed further below, the Department has a strong interest in enforcement of the Immigration and Nationality Act, including enforcement of the H-2A visa program. The fact that time elapsed prior to the Department filing an order of reference with the OALJ to initiate proceedings and that the ALJ did not hold an administrative hearing within 60 days does not detract from the Department's mission, interest, and potential harm to its enforcement if the administrative proceeding is delayed.

More to the point, it is Plaintiff's burden as the movant seeking immediate injunctive relief to adduce the requisite proof that it will suffer irreparable harm, not the Department's burden to show that it would be irreparably harmed if Plaintiff is granted relief. *S.C. Progressive Network*, 493 F. Supp. 3d at 465. Plaintiff's delay in seeking injunctive relief until days before a July 24, 2025 discovery deadline in the administrative proceeding – a deadline that Plaintiff complains is "a harm that will befall Del Valle Fresh within a week from the filing date of this Motion," Pl.'s Mem. 12 – weighs against a finding of irreparable harm. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (recognizing that a delay in initiating a preliminary injunction proceeding may "'indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'") (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). Plaintiff requested an administrative hearing in September 2023 but did not assert its Seventh Amendment rights until February 2025, and did not seek injunctive relief from this court until July 18, 2025, after the Department informed Plaintiff that the Department could not agree to hold discovery in abeyance because the administrative hearing is set for hearing in November 2025 and the Department had already agreed to three 30-day extensions providing Plaintiff additional time to provide its responses to initial discovery requests that were served in March 2025. *See* Ex. A to Decl. of Leon Sequeira, Dkt. No. 15-3.

Finally, "[b]ecause [a movant's] failure on any *Winter* factor is fatal," there is no need to analyze the remaining factors. *USA Farm Labor*, 2025 WL 586339, at *4 (because the balance of the equities and the public interest did not favor an injunction, the Fourth Circuit "decide[d] this case without analyzing the remaining factors"); *Viktus*, 79 F.4th at 361. Such is the case here: because Plaintiff's claims fail on the merits and it has also failed to establish irreparable injury, it cannot establish entitlement to a temporary restraining order or preliminary injunction.

### III.    The balance of the equities do not favor entering an injunction here.

The third and fourth injunctive factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These combined factors weigh against relief here because the public has a strong interest in enforcement of the Immigration and Nationality Act, including enforcement of the H-2A visa program. Enjoining the administrative proceeding at issue would frustrate those Congressional objectives, preventing the Secretary of Labor from ensuring that the employment of temporary foreign agricultural workers does not "adversely affect the wages and working conditions of" similarly employed workers in the U.S. and enforcing employer compliance with terms and conditions of the H-2A program, 8 U.S.C. § 1188(a)(1), and causing the United States to "suffer[] a form of irreparable injury" as a result. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *cf. Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021) ("[T]he public interest necessarily weighs against enjoining a duly enacted statute."). On the other hand, Plaintiff has not shown that it will suffer any harm from proceeding with the ongoing administrative proceedings before this Court has the opportunity to decide this case on the merits, because the hearing in question is not scheduled to occur until November 5, 2025.

### CONCLUSION

For these reasons, the Court should deny Plaintiff's motion.

[Signature on following page]

34

Respectfully Submitted,

BRYAN STIRLING
UNITED STATES ATTORNEY

By:     */s/Joanna B. Stroud*
        Joanna B. Stroud (#11245)
        Assistant United States Attorney
        United States Attorney's Office
        District of South Carolina
        151 Meeting Street, Suite 200
        Charleston, SC 29401
        Telephone No. (843) 460-3260
        E-mail: Joanna.Stroud@usdoj.gov

August 28, 2025                         Counsel for Federal Defendants